## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**SCHOENING INVESTMENT, LP,**

     **Plaintiff,**

       **v.**

**THE CINCINNATI CASUALTY COMPANY,**

     **Defendant.**

**Case No. 1:24-cv-137**

**JUDGE DOUGLAS R. COLE**

### OPINION AND ORDER

This putative class action concerns a commercial property insurance policy and a not uncommon grievance—an insured's belief that its insurance policy entitles it to more money from its insurer than it received. Specifically, Plaintiff Schoening Investment, LP alleges (on behalf of itself and a putative class of insureds in Kentucky and Arizona) that Defendant The Cincinnati Casualty Company breached its insurance policy by undervaluing an actual cash value (ACV) payment it made to Schoening after Schoening suffered a covered partial structural loss to one of its properties. (By partial structural loss, the Court (and Schoening) means structural damage where estimated repair costs are lower than estimated replacement costs.)

Importantly, though, Schoening contends that Cincinnati Casualty breached its contract in one very specific way. According to Schoening, the policy at issue does not allow Cincinnati Casualty to deduct any amount for depreciation from the otherwise-applicable ACV payments that would be due for partial structural losses. And that depreciation-based shortfall in ACV-based payments for partial structural

losses is the *only* shortfall that Schoening alleges. That is, Schoening specifically disclaims any challenge to *how* Cincinnati Casualty calculated the underlying ACV payment amount itself (i.e., before depreciation is deducted), and any challenge to *how* Cincinnati Casualty calculates the amount of depreciation. Rather, all Schoening challenges here is *whether* the insurer is entitled to deduct depreciation from such payments at all.

Cincinnati Casualty, not surprisingly, says that Schoening misreads the policy. In fact, Cincinnati Casualty contends that the policy terms are sufficiently unambiguous on the depreciation issue that the Court should dismiss the suit.

As discussed more fully below, the Court agrees with Cincinnati Casualty. While the policy at issue may be ambiguous on various fronts—including as to how to calculate ACV before depreciation is deducted—it unambiguously allows Cincinnati Casualty to deduct depreciation from ACV-based payments for partial structural losses under the coverage at issue. Accordingly, the Court **GRANTS IN PART** Defendant The Cincinnati Casualty Company's Motion to Dismiss the Complaint or Alternatively to Strike Class Allegations (Doc. 4), and **DISMISSES WITH PREJUDICE** Schoening's Complaint (Doc. 1).

# BACKGROUND

## A.     Factual Overview.[1]

Schoening is a limited partnership whose partners all reside in Florida.[2] (Doc.

1, #4). It owned a commercial structure located at 4304 Poplar Level Road, Louisville,

Kentucky 40213 (the Property). (*Id.*). Cincinnati Casualty is an Ohio company with

its principal place of business in Cincinnati, Ohio, that sells property insurance

coverage for buildings and structures (among other things) in Arizona and Kentucky

(among other places). (*Id.* at #4–5). Schoening purchased and regularly paid

premiums on an insurance policy from Cincinnati Casualty for the Property (the

Policy).[3] (*Id.* at #6).

---

[1] Since this matter is before the Court on Cincinnati Casualty's motion to dismiss, the Court must accept the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). So while the Court relies on the Complaint's allegations to recount the case's background, it reminds the reader that they are just that—allegations.

[2] Schoening's Complaint instead refers to the "individual members" of the limited partnership in its allegations relating to jurisdiction. (Doc. 1, #4). But, while an LLC's citizenship is determined based on "members," *Akno 1010 Mkt. St. St. Louis Missouri LLC v. Pourtaghi*, 43 F.4th 624, 626 (6th Cir. 2022), a limited partnership's citizenship is based on "where its general *and* limited partners reside," *Hooper v. Wolfe*, 396 F.3d 744, 748 (6th Cir. 2005) (emphasis in original). The Court thus understands Schoening to be alleging that its partners, both general and limited, all reside in Florida, not its "individual members."

[3] While Schoening alleges that the policy number at issue is "ECP 046 12 71 / EBA 046 13 71," it did not attach the Policy to the Complaint. (Doc. 1, #6). Cincinnati Casualty supposedly attached the Policy to its motion to dismiss. (Doc. 4, #28 n.1; *see* Doc. 4-1). But the document Cincinnati Casualty attached to its motion has a different policy number from the one alleged in the Complaint—EPP 014 27 42. (Doc. 4-1, #45). That same policy number, again different from the one listed in the Complaint, appears on an attachment to Schoening's Response, which suggests Schoening included the incorrect policy number in its Complaint. (*See* Doc. 13-1, #263). Complicating matters further, the Policy (assuming the document the insurer attached is, in fact, the Policy) covers eleven different properties that Schoening owns, but none of the properties listed are 4304 Poplar Level Road. (*See* Doc. 4-1, #49). There is, however, a 430**3** Poplar Level Road listed. (*Id.*). Because Schoening did not object to the Policy

On March 18, 2022, the Property suffered damage (although that damage is unspecified) and Schoening timely submitted a claim to its insurer. (*Id.*). The parties do not dispute that a covered loss occurred to the Property. (*Id.*; Doc. 4, #28). And Schoening does not allege Cincinnati Casualty refused to pay anything at all for the covered loss. Rather, the parties solely dispute whether the insurer was entitled to deduct an amount for depreciation from the ACV-based payment that Cincinnati Casualty disbursed to Schoening. (Doc. 1, #7; Doc. 4, #27).

Cincinnati Casualty's claim-adjusting efforts in this case began when its adjuster arrived shortly after Schoening reported the Property as damaged. The adjuster's job was to assess the loss and determine the proper payment. (Doc. 1, #7). The adjuster first determined that the Property "could be repaired as opposed to complete[ly] replace[d]." (*Id.* at #6). Then, based on that determination, the insurer "calculate[d] its actual cash value [i.e., ACV] payment obligations … by first estimating the cost to repair the damage with new materials, and then … subtract[ing] the estimated depreciation."[4] (*Id.* at #6–8). As noted, it is that

---

that Cincinnati Casualty attached to its motion and since the Complaint takes issue with the "standard form policy language," (Doc. 1, #1), the Court concludes that it can proceed, even while it has some concerns about the inconsistent policy numbers that the parties provided.

[4] The Complaint says that Cincinnati Casualty's adjuster calculated the estimated costs and made the depreciation deduction through a software called Xactimate. (Doc. 1, #7). That software, with the help of the adjuster's informational inputs (e.g., "the dimensions of the damaged property"), generates a specific estimated dollar amount for necessary repairs using "ongoing fair market pricing research." (*Id.* at #8). In the final steps of the process, the adjuster decides whether to apply depreciation based on a series of checked or unchecked options. (*Id.*). According to Schoening, because of how this process functions, the software can easily either apply or withhold depreciation. (*Id.*).

latter subtraction that forms the sole basis for this lawsuit.[5] According to Schoening, the Policy does "not permit the withholding of depreciation on partial losses for which Defendant estimates a repair (as opposed to a replacement)." (*Id.*). And that in turn means that Cincinnati Casualty "materially breached its duty to indemnify" Schoening in one specific way. Schoening alleges that, by withholding depreciation from the repair costs, Cincinnati Casualty paid Schoening less than it was entitled to receive, which in turn also deprived Schoening of the time value of that money. (*Id.* at #9).

Schoening responded to the alleged depreciation-based shortfall by suing Cincinnati Casualty on March 15, 2024. In its Complaint, Schoening asserts, on behalf of itself and a putative Arizona- and Kentucky-based class, a claim for breach of contract.[6] (*Id.* at #15–16). And it seeks both monetary relief and a declaratory judgment. (*Id.* at #16–18).

Importantly, according to Schoening, this case boils down to a single issue— whether Cincinnati Casualty's "standard form policy language allows for depreciation on partial losses in which [the insurer's] estimate and claim payment were based on proposed *repairs* to damaged insured structures." (*Id.* at #1 (emphasis in original)). In other words, under the Policy, may Cincinnati Casualty "subtract depreciation on

---

[5] In other words, Schoening takes no issue with whether Cincinnati Casualty correctly paid repair costs, rather than, for example, replacement costs. Nor does it challenge how the insurer estimated the repair costs. (*See* Doc. 1, #16 ("Plaintiff and the putative class do not dispute the repair costs calculated by Defendant.")). Rather, the only claim is that Cincinnati Casualty was not entitled to deduct any amount for depreciation.

[6] Schoening alleges that "[t]here are more than 100 members in the proposed class and the amount in controversy exceeds $5,000,000, exclusive of interest and costs," as required under 28 U.S.C § 1332(d)(2). (Doc. 1, #5).

partial structural losses when it calculates its actual cash value ("ACV") payment obligations?" (*Id.*). Schoening says the answer is unequivocally "no." In fact, it argues that the Supreme Court of Kentucky squarely foreclosed Cincinnati Casualty's ability to do so in *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368 (Ky. 2000). (*Id.* at #1–4).

Cincinnati Casualty disagrees. It moves to dismiss Schoening's Complaint, claiming that the Policy unambiguously allowed it to reduce the ACV-based payments to account for depreciation. (Doc. 4, #31–36). It reaches that conclusion through two steps. First, Cincinnati Casualty notes that Schoening opted for an optional coverage—called Replacement Cost coverage (as further described below)—which alters the insurer's obligations under the Policy. (*Id.* at #31–34). Then, based on the language specifying the terms of that optional coverage, it argues that the Policy allows for depreciation on partial structural losses (and that *Farmland* is inapposite). (*Id.* at #34–36). Schoening responded, (Doc. 13), and Cincinnati Casualty replied, (Doc. 16), so the motion is ripe.

## B. The Insurance Policy at Issue.

Not surprisingly, the Policy itself is central to this case. So the Court starts by walking through its relevant provisions.[7] First, the Policy includes a "Schedule of

---

[7] While Schoening did not attach the Policy to its Complaint, the Court may consider it at this stage since the Policy "is referred to in the pleadings and is integral to [Schoening's] claims." *Com. Money Ctr., Inc. v. Ill. Union Ins.*, 508 F.3d 327, 335–36 (6th Cir. 2007). The same goes for the ACV payment cover letter, (Doc. 13-1), Schoening attached to its Response. Schoening repeatedly discusses the calculation of the ACV payment (which the cover letter memorializes in the specific circumstances of this particular loss), and is also integral to the claims.

Locations," which lists the covered properties—in this case, eleven—and assigns each a location number. (Doc. 4-1, #49). The Policy labels the Property as location "1." (*Id.*). A separate form appended to the Policy, called the "Commercial Property Coverage Part Declarations," then describes the type of coverage each covered property receives and provides other important information such as limits of liability, coinsurance, deductibles, and any applicable optional coverages. (*Id.* at #65). For the Property, the coverage type is listed as "building," the limit of liability is $2,011,192, coinsurance is 90%, and the deductible is $5,000. (*Id.*). Importantly, the Property also has an optional coverage that Schoening selected: "Replacement Cost" (which the Court further describes below). (*Id.*).

Because the coverage type is "building," the terms of the coverage itself are set forth in the "Building and Personal Property Coverage Form." (*Id.* at #66–105). Since the parties do not dispute that Schoening suffered a covered loss, the Court skips over the many provisions describing how to determine whether such a loss occurred. Instead, the Court will focus on the three sections that inform this dispute: (1) "Section D. Loss Conditions"; (2) "Section F. Optional Coverages"; and (3) "Section G. Definitions." (*Id.* at #95–105). In particular, the Court will focus on two specific provisions in Section D, and one each in Sections F and G.

*The Loss Payment Provision*

The first such provision, which is located in Section D, and which the Court will call the Loss Payment Provision, reads in relevant part as follows:

> a. In the event of 'loss' insured by this Coverage Part, at our option, we will either:

7

(1) Pay the value of the lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of SECTION D. LOSS CONDITIONS, 7. Valuation or any applicable provision that amends or supersedes this valuation condition.

(*Id.* at #96). Of the four options available to the insurer, only options 1 and 2—paying the "value of the … damaged property" and paying "the cost of repairing or replacing the … damaged property"—are relevant here.

*The Valuation Provision*

As the Loss Payment Provision notes, the insurer will "determine the value" of both of those payments in accordance with "Section D. Loss Conditions, 7," which is the second relevant provision from Section D. (*Id.*). The Court refers to that provision as the Valuation Provision. It states in relevant part: "We will determine the value of Covered Property in the event of direct 'loss' as follows: … At 'Actual Cash Value' as of the time of the direct 'loss', except as provided in [non-applicable provisions]."[8] (*Id.* at #99).

---

[8] The Policy distinguishes between "direct" losses, which are covered, and "indirect" losses, which are not. No one disputes that the loss Schoening suffered here was a direct loss.

*The Definitions Section*

So that in turn requires an understanding of what the term "Actual Cash Value" means. On that front, the Policy informs the reader that phrases in quotation marks (like "Actual Cash Value") "have special meaning," as set forth in "Section G. Definitions," which the Court will call the Definitions Section. (*Id.* at #68). According to the Definitions Section, "'Actual cash value' means replacement cost less a deduction that reflects depreciation, age, condition and obsolescence."[9] (*Id.* at #103).

So that definition forms the basis for how Cincinnati Casualty is to calculate amounts due under options 1 and 2 of the Loss Payment Provision. In other words, whether as to "the value of lost or damaged property," or "the cost of its repair," or "the cost of its … replacement," the Loss Payment Provision sets the payment amount at "replacement cost less a deduction that reflects depreciation, age, condition and obsolescence." (*Id.* at #96, 99, 103).[10]

*The Replacement Cost Provision*

But that's not the end of the story. As already noted, here Schoening had selected a specific *optional* coverage for the property—one of the coverages available under Section F, Optional Coverages—that the Policy labels "Replacement Cost." (*Id.*

---

[9] Although the Valuation Provision uses "Actual Cash Value," (i.e., capital "C" in Cash, capital "V" in Value), as the defined term, the Definitions Section actually defines "Actual cash value." (Doc. 4-1, #99, 103). The Court treats that as a scrivener's error.

[10] The Court concedes that it is potentially troubling that the Actual Cash Value definition appears to equate those three measures—the value of the damaged property, the cost of its repair, and the cost of its replacement—setting each to "replacement cost less a deduction that reflects depreciation, age, condition and obsolescence." (*See* Doc. 4-1, #96, 103). The Court explains below, though, why it concludes that this is the only reasonable understanding of the Policy.

at #65). That election changes how the Policy—and in particular the Valuation Provision—operates. In the "Optional Coverages" section, the "Replacement Cost" provision (which the Court will call the Replacement Cost Provision) starts with a significant declaration: "Replacement cost (without deduction for depreciation) *replaces* 'Actual Cash Value' in [the Valuation Provision]." (*Id.* at #102 (emphasis added)). So now it is the Replacement Cost Provision, rather than the definition of Actual Cash Value from the Definitions Section, that controls the payout. (*Id.*).

So what does the Replacement Cost Provision state in terms of determining the payout amount? It essentially gives the insured the option to demand either, or both of, (1) an Actual-Cash-Value-based payout, or (2) a replacement-cost-based payout. And then it provides some additional limitations on the payment if the insured chooses the replacement-cost-based payout (e.g., that the insured can receive such a payout only if the insured actually repairs or replaces the property):

> c. *You may make a claim for "loss" covered by this insurance on an "Actual Cash Value" basis instead of on a replacement cost basis.* In the event you elect to have 'loss' settled on an "Actual Cash Value" basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the "loss".
>
> d. We will not pay on a replacement cost basis for any "loss":
>
> > (1) Until the lost or damaged property is actually repaired or replaced with other property of generally the same construction and used for the same purpose as the lost or damaged property; and
> >
> > (2) Unless the repairs or replacement have been completed or at least underway within 2 years following the date of 'loss'.
>
> e. We will not pay more for 'loss' on a replacement cost basis than the least of:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace, on the same 'premises', the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purposes; or

(3) The Amount you actually spend that is necessary to repair or replace the lost or damaged property.

(*Id.* at #102–03 (emphasis added)).

In short, the Optional Coverage allows the insured to elect between two valuation methods: an ACV-based payment or a replacement-cost-based payment, with the latter methodology applying to both "repairs or replacement" and being available to the insured only if the insured actually repairs or replaces the property.[11] (*Id.*). But importantly, if the insured elects to receive an ACV-based payout, the

---

[11] There are alternative options besides payouts. Recall the Loss Payment Provision. Only the first two options ("(1) Pay the value of the lost or damaged property; (2) Pay the cost of repairing or replacing the lost or damaged property") involve payouts. (Doc. 4-1, #96). The next two options provided in that provision offer non-payout options that Cincinnati Casualty could take. First, it could "[t]ake all or any part of the property at an agreed or appraised value." (*Id.*). Second, it could "[r]epair, rebuild or replace the property with other property of like kind and quality." (*Id.*). While it is tempting to think the latter option may apply in this instance, it does not. That option is about the insurer taking it upon itself to repair, rebuild, or replace the insured property and concerns "essentially whether the insurer can satisfy its obligation by paying less than actual cash value." *Cincinnati Specialty Underwriters Ins. Co. v. C.F.L.P. 1, LLC*, No. 3:14-cv-40, 2015 WL 5793951, at *2 (W.D. Ky. Sept. 30, 2015) (emphasis omitted) (quoting *Couch on Insurance* § 176:1 (3d ed. 2014)); *see also Couch on Insurance* § 176:2 (3d ed. 2024) ("Since provisions giving the insurer the option to repair, rebuild, or replace are not inherent in the contract of insurance, no such right exists unless expressly stated in the contract."). Cincinnati Casualty, however, appears to confuse the second option—involving a payout determined by an actual cash value or replacement cost valuation—and the fourth option—allowing the insurer to repair, rebuild, or replace the property—in its Reply and misreads *Cincinnati Special Underwriters*. (Doc. 16, #286–87). Nonetheless, the Complaint makes clear that Cincinnati Casualty likely opted for the second option provided in the Loss Payment Provision: to "[p]ay the cost of repairing or replacing the damaged property." (Doc. 4-1, #96; *accord* Doc. 1, #6). The "ACV payment cover letter," Schoening attached to its Response supports a finding that this was the option Cincinnati Casualty took as well. (Doc. 13, #225, n.4; Doc. 13-1).

Replacement Cost Provision does not alter the meaning of that term. That is, the Replacement Cost Provision incorporates the defined term "Actual Cash Value" in discussing the ACV-based payouts available under this coverage. And recall the Definitions Section defines that term as "replacement cost *less a deduction that reflects depreciation*, age, condition and obsolescence." (*Id.* at #103 (emphasis added)). So under the Replacement Cost Provision's purview, if Schoening elected to receive an ACV-based payment that payment would still have a depreciation deduction. A replacement-cost-based payout under the Replacement Cost Provision, by contrast, would not. Rather, the latter payout is determined solely by reference to the amount the policyholder "actually spend[s] that is necessary to repair or replace the lost or damaged property," i.e., with no mention of any deduction for depreciation. (*Id.* at #102–03). And again, that is so whether the insured "repairs" or "replaces" the damaged property.

Further confirming that the ACV-based and the replacement-cost-based options under the Replacement Cost Provision are different, and that the ACV-based payout is typically lower (as it would be if it had a depreciation deduction), the Replacement Cost Provision also makes clear that policyholders who have elected this Optional Coverage have the ability in some circumstances to *first* receive the ACV-based payment and then *also* receive an additional amount to gross them up to the full amount available under the replacement-cost-based methodology. That is, subsection (c) of the Replacement Cost Provision specifically provides that the insured can "make a claim" based on ACV, and can then "still make a claim for the additional

12

coverage this Optional Coverage provides." (*Id.* at #102). To do that, though, they must both (1) make the election within 180 days, (2) actually repair or replace the damaged property, and (3) start doing so within two years. (*Id.* at #102–03).

The Policy therefore creates something of a tradeoff for policyholders who have experienced a loss and who have selected this Optional Coverage. They can apparently forgo the optional Replacement Cost coverage and automatically receive an ACV-based payment (adjusted for depreciation) after making a claim for loss (assuming the loss is covered). Alternatively, they can select the optional replacement-cost-based coverage, with the upside of receiving a potentially higher payment than an ACV-based payment, but only if they actually repair or replace the property within the specified time. These tradeoffs and distinctions between the coverages are important to keep in mind as the Court moves into its analysis of the specific ACV-based payment issue Schoening raises here.

## C.    The Prior Lawsuit Concerning Labor Depreciation.

There is one final factual wrinkle to this case that the Court must address at the outset concerning the term "depreciation." Cincinnati Casualty points out that Schoening was part of a settlement class in a related case in the Eastern District of Tennessee that settled in May 2024.[12] (Doc. 4, #27, 30–31; s*ee* Order & J., *Belle Meade*

---

[12] The settlement class in that case included "[a]ll policyholders under any residential or commercial property insurance policy issued by Defendants, who had: (a) a Structural Loss that was a Covered Loss for property in *Arizona*, California, Illinois, *Kentucky*, Missouri, Ohio, Tennessee, Texas, Vermont, Virginia, Washington, or Wisconsin during the applicable Class Periods; and (b) that *resulted in an ACV Payment from which Nonmaterial Depreciation was withheld*, or that would have resulted in an ACV Payment but for the withholding of Nonmaterial Depreciation causing the loss to drop below the applicable

*Owner Ass'n, Inc. v. The Cincinnati Ins. Co.*, No. 3:22-cv-123 (E.D. Tenn. May 13, 2024), Doc. 63). Under the class action settlement agreement in that case (which the court approved), the settlement class released claims related to, concerning, arising from, or pertaining in any way to deductions from ACV for what that settlement described as "Nonmaterial Depreciation." (Order & J., *Belle Meade*, No. 3:22-cv-123, Doc. 63, #1114–15). That phrase refers to depreciation relating to things other than materials, such as, for example, labor. (*Id.* at #1114). So Cincinnati Casualty asserts that, "[t]o the extent the Complaint seeks relief related to the deduction of any nonmaterial depreciation, including labor depreciation, those claims were released as part of the *Belle Meade* class settlement." (Doc. 4, #30). In other words, Schoening's claims here must concern only depreciation that applies to materials (e.g., building products, etc.). The Court agrees. Especially given that Schoening did not respond or object in any way to Cincinnati Casualty's assertions on this point. The Court therefore construes the Complaint as challenging only depreciation that the insurer calculated based on materials and not depreciation of nonmaterial items like labor.

Finally, the Court notes one other interesting tidbit from *Belle Meade*. The definition of "actual cash value" in the policy at issue there was the same as the one at issue here. (*Compare* Ex. A, *Belle Meade*, No. 3:22-cv-123 (E.D. Tenn. Apr. 4, 2023), Doc. 37-1, #218 ("'Actual cash value' means replacement cost less a deduction that

---

deductible." (*Belle Meade*, No. 3:22-cv-123, Doc. 63, #1104 (emphasis added)). This plainly includes Schoening, and Schoening does not object. Additionally, Schoening's covered loss occurred on March 18, 2022, which is within the relevant class period in that case. (*Id.* at #1105; Doc. 1, #6).

reflects depreciation, age, condition and obsolescence."), *with* Doc. 4-1, #103). But, within the settlement agreement in *Belle Meade*, the parties further clarified that the term "ACV Payment" for the purposes of the settlement agreement meant "an actual cash value payment made on an insurance claim for a Structural Loss, calculated by estimating *the cost to repair or replace covered damage*, and subtracting estimated Depreciation, including Nonmaterial Depreciation, and any applicable deductible." (*See* Order & J., *Belle Meade*, No. 3:22-cv-123, Doc. 63, #1113 (emphasis added)). While that settlement definition is not a binding interpretation of the Policy in this instance (since this claim is not covered by the settlement agreement there), the Court does find it at least somewhat informative. Specifically, the attorneys of record in that action—the same attorneys of record here—agreed to define ACV in that manner under a policy, from the same insurer, that is identical in all material respects to the Policy here.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the

15

Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (cleaned up).

A court analyzing a motion to dismiss under Rule 12(b)(6) generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). Usually, that limits a court to considering the complaint and any documents attached to it. *Id.* But sometimes a court may properly consider other things. For example, a court may consider documents a defendant attaches to its motion, though only to the extent that those documents are referenced in the complaint and central to the claims. *Id.* at 344. Or if the pleadings refer to a written instrument that is integral to the claims, the court may consider it without converting a motion to dismiss into one for summary judgment. *Com. Money Ctr., Inc. v. Ill. Union Ins.*, 508 F.3d 327, 335–36 (6th Cir. 2007); Fed. R. Civ. P. 10(c). "These written instruments are records falling within a narrowly defined class of legally significant documents on which a party's action or defense is based. As a result, they often create or define legal rights or obligations, or define or reflect a change in legal relationships." *Anderson v. ABF Freight Sys., Inc.*, No. 1:23-cv-278, 2024 WL 51255, at *9 (S.D. Ohio Jan. 4, 2024) (cleaned up); *cf. Brown v. Travelers Cas. Ins. Co. of Am.*, No. 15-50, 2016 WL 1644342, at *2 (E.D. Ky. Apr. 25, 2016) ("Where, as here, a complaint refers to an insurance policy that is central to the plaintiffs' claims, a court may properly consider these policies as part of a Rule 12(c) motion."). Finally, a court can consider public records or decisions of public agencies. *J.P. Silverton Indus. L.P. v. Sohm*, 243 F. App'x 82, 86 (6th Cir. 2007).

LAW AND ANALYSIS

Resolving the pending motion requires the Court to undertake two distinct inquiries. First, the Court must determine which law applies. Then, armed with that law, the Court must determine whether Schoening has stated a plausible breach of contract claim under the Policy. Here, the Court concludes that the answer to the first question is "Kentucky law," and that under Kentucky law the answer to the second question is "no."

## A. Kentucky Law Applies, and It Holds That the Interpretation of Unambiguous Terms in an Insurance Policy Is a Matter of Law.

Schoening is a limited partnership whose partners all reside in Florida, while Cincinnati Casualty is an Ohio company, and the insured property is located in Kentucky. This Court has diversity jurisdiction under 28 U.S.C. § 1332(d)(2), so the first question is which state's law applies?

Cincinnati Casualty is correct that "[w]hen interpreting a contract in a diversity case, the court applies the law, including the choice of law rules, of the forum state." *Whitehouse Condo. Grp., LLC v. Cincinnati Ins. Co.*, 569 F. App'x 413, 415 (6th Cir. 2014). But Cincinnati Casualty seems to misunderstand the forum state here, as it directs the Court to Kentucky's choice-of-law rules. (*See* Doc. 4, #38, n.29). This Court sits in the Southern District of Ohio, so Ohio choice-of-law principles control.

When, as here, "the parties have not specified which state's substantive law should govern the contract," "Ohio's choice of law rules require a court to apply the law of the state with the most significant relationship to the contract." *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996). That is the same approach

17

reflected in Restatement (Second) of Conflicts § 188. And it directs courts to consider the following factors in assessing the most significant relationship: the place of contracting; the place the parties negotiated the contract; the place of performance; the location of the contract's subject matter; and the domicile or place of business of the parties. *Id.* at 605. After considering these factors here, the Court finds they favor applying Kentucky law.

To start, "the most important factor [is] the principal location of the insured risk." *Allstate Fire & Cas. Ins. Co. v. Moore*, 993 N.E.2d 429, 436 (Ohio Ct. App. 2013); *see also* Restatement (Second) of Conflict of Laws § 188 cmt. e (1971) ("[W]hen the thing or the risk is the principal subject of the contract, it can often be assumed that the parties … expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract."). Here, the Property is in Kentucky. (Doc. 1, #4; Doc. 4-1, #49). Next, "the place of contracting and the place of negotiation are inconclusive and are relatively insignificant in this case." *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 950 (S.D. Ohio 2002). Nonetheless, the local agency listed on the policy operates out of Louisville, Kentucky, so that provides some evidence that the place of contracting was Kentucky. (Doc. 4-1, #45). Considering the third factor, "in insurance cases, the place where an insurance policy is performed is the place where the insurance benefits are (or would be) paid." *Troy Stacy Enters. Inc. v. Cincinnati Ins. Co.*, 563 F. Supp. 3d 738, 745 (S.D. Ohio 2021), *aff'd*, No. 21-4008, 2022 WL 2062001 (6th Cir. June 8, 2022). Here that appears to be Florida because the insured has Winter Springs, Florida, listed as its address

18

on the Policy. (Doc. 4-1, #45). Finally, the Court has already discussed the parties' domiciles, but notes that both parties also seem to conduct business in Kentucky as well (through the ownership of properties and through the selling of insurance policies through local agencies, respectively). All told, the Court finds that it is best to weigh the location of the Property most heavily and to apply Kentucky law.

So then the Court must determine how Kentucky law goes about interpreting insurance policies. "It is well-settled under Kentucky law that the proper interpretation, construction, and legal effect of an insurance contract are matters of law to be decided by a court." *Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.*, 857 F. Supp. 2d 647, 657 (W.D. Ky. 2012), *aff'd*, 732 F.3d 645 (6th Cir. 2013). Like any other contract, an insurance policy "must be construed as a whole, giving effect to all parts and every word in it if possible." *ISCO Indus., Inc. v. Fed. Ins. Co.*, 587 F. Supp. 3d 558, 568 (W.D. Ky. 2022) (quotation omitted). But "[t]he Kentucky Supreme Court has set forth two cardinal principles of insurance contract interpretation: '(1) the contract should be liberally construed and all doubts resolved in favor of the insureds; and, (2) exceptions and exclusions should be strictly construed to make insurance effective.'" *Id.* (quoting *Ky. Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992)). That said, while ambiguous terms are construed "against the drafter and in favor of the insured," the Court "must also give the policy a reasonable interpretation, and there is no requirement that every doubt be resolved against the insurer." *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 810–11 (Ky. Ct. App. 2000). Also, "[i]n the absence of ambiguity, a written instrument will be enforced

strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *River City Fraternal Ord. of Police Lodge 614, Inc. v. Louisville/Jefferson Cnty. Metro. Gov't*, 585 S.W.3d 258, 266 (Ky. Ct. App. 2019) (quotation omitted). That is, terms should be read "in light of the usage and understanding of the average person." *Stone*, 34 S.W.3d at 811.

Here, because the Court "is not required to make factual findings, the determination is purely a matter of law," and that means the case is amenable to resolution at the motion-to-dismiss stage. *Snowden v. City of Wilmore*, 412 S.W.3d 195, 206 (Ky. Ct. App. 2013); *see, e.g.*, *Premier Surgery Props., LLC v. Jewish Hosp. & St. Mary's Healthcare, Inc.*, No. 2023-ca-914, 2024 WL 1589656, at *2 (Ky. Ct. App. Apr. 12, 2024), *review denied* (Aug. 14, 2024). Indeed, while the parties' view on the issue is certainly not controlling, it is worth noting that neither party argues the Policy is ambiguous. Rather, as Schoening succinctly frames it, "[t]his is a question of law[:] does withholding depreciation from repair costs breach [Cincinnati Casualty's] policy form as a matter of law?" (Doc. 13, #247). Answering that question is the task to which the Court turns next.

## B. The Unambiguous Policy Terms Show That Schoening's Depreciation-Based Challenge Fails.

In seeking dismissal, Cincinnati Casualty initially points to two shortcomings in Schoening's allegations relating to Schoening's conduct in making the underlying insurance claim. The insurer claims that each of these shortcomings dooms Schoening's breach of contract claim. First, Cincinnati Casualty argues that its

payment obligation under the Optional Coverage "did not arise" because Schoening does not allege that it actually repaired or replaced the property. (Doc. 4, #32–33). Second, the insurer argues that Schoening also fails to allege that it elected to receive an ACV-based payment under the Replacement Cost Provision, and that this is independently fatal to Schoening's claim. (*Id.* at #33–34). The Court finds the first argument irrelevant and affirmatively disagrees with the second.

But that is not the end of the story. Cincinnati Casualty separately argues that the Policy unambiguously allows it to deduct depreciation from ACV-based payments under the Replacement Cost Provision. (*Id.* at #34–36). On this front, the Court agrees with the insurer.

1. **Schoening's Failure to Allege It Repaired the Property and Its Potential Lack of Election for ACV Payment Is Not Fatal to Its Claim.**

Start with Cincinnati Casualty's first two arguments. All agree that Schoening elected one of the optional coverages—Replacement Cost coverage. And, as a result, the Replacement Cost Provision supersedes the definition of Actual Cash Value in the Valuation Provision. As described above, the Replacement Cost Provision provides coverage on either an ACV basis or a replacement-cost basis. But the latter is available only when the insured has actually repaired or replaced the damaged property. Seizing on that pre-condition to replacement-cost-based recovery, Cincinnati Casualty notes that Schoening has not alleged that it either repaired or replaced the property here. (Doc. 4, #32–33). But, while that is true, it does not matter. Schoening is not alleging that the insurer breached the Policy by failing to

21

provide payment under the Replacement Cost Provision on a replacement-cost basis. Rather, Schoening argues that when an insured receives an ACV-based payment governed by the Replacement Cost Provision the insured is entitled to an ACV-based payment that is not reduced by any "sums withheld as depreciation." (Doc. 1, #4, 18). In other words, Schoening's challenge here goes to how an ACV-based payment is calculated under the Replacement Cost Provision, and specifically to whether Cincinnati Casualty is allowed to deduct depreciation from ACV-based payments under that provision. What Cincinnati Casualty's payment obligation under the Replacement Cost Provision would have been on a replacement-cost basis (which, as noted, is a separate form of loss calculation that the Replacement Cost Provision allows) is simply irrelevant.

Second, the insurer argues that "Schoening does not allege that it elected to make a claim on an ACV basis, which alone is fatal to [its] claims." (Doc. 4, #33–34). But the Court disagrees that Schoening needed to explicitly allege that it elected to make a claim for ACV-based coverage in the pleadings. True, the Replacement Cost Provision in the Policy requires the insured to affirmatively elect to receive an ACV-based payment. (*See* Doc. 4-1, #102 ("*You may make* a claim for 'loss' covered by this insurance on an [ACV] basis instead of on a replacement cost basis. In the event *you elect* to have 'loss settled on an [ACV] basis…*" (emphasis added))). But here the Complaint alleges that Schoening "timely submitted a claim to [Cincinnati Casualty] requesting payment for the covered loss," which is enough to support a reasonable inference that Schoening in fact elected ACV-based coverage, as that is the only

22

coverage an insured can obtain under the Replacement Cost Provision without actually repairing or replacing the property (which Schoening does not allege it did). (Doc. 1, #6). And in any event, the Complaint alleges that the insurer "affirmatively and unilaterally" made an ACV payment to Schoening. (*Id.* at #6–7). Taking that allegation as true, as the Court must, Cincinnati Casualty cannot circumvent a lawsuit by invoking a contractual clause that requires action on the part of the insured, while simultaneously apparently depriving the insured of the opportunity to take such action by essentially taking it on the insured's behalf.[13] In short, the Complaint's allegations support a plausible inference that Schoening sought (or at least received) an ACV-based payment under the Replacement Cost Provision in the Policy. The question, then, is whether the Policy allowed the insurer to reduce that ACV-based payment for depreciation; that is the topic to which the Court turns next.

---

[13] Schoening argues that under the Policy, "the policyholder can disregard the 'Optional [Replacement Cost] Coverage' and simply receive an ACV payment, which is precisely what Schoening elected to do here as evidenced by the fact that [Cincinnati Casualty] affirmatively made an ACV payment." (Doc. 13, #232–33). While this may be common industry practice, as Schoening suggests, the contractual language here does not allow the insured to simply "disregard" the replacement-cost coverage as in some cases Schoening cites. *See, e.g., Lafollette v. Liberty Mut. Fire Ins. Co.,* No. 2:14-cv-4147, 2017 WL 1026424, at *9 (W.D. Mo. Mar. 16, 2017) (explaining policy language allowing the insured to "disregard the replacement cost loss settlement provisions and make a claim under th[e] policy for loss or damage to buildings on an [ACV] basis"); *Franklin v. Lexington Ins. Co.,* 652 S.W.3d 286, 293 (Mo. Ct. App. 2022) (explaining that, unlike here, "[n]othing in the policy required [the insured] to affirmatively state that she was filing a claim under the ACV coverage provisions"). In an abundance of caution, and in the absence of discovery on the issue, the Court does not conclusively decide here whether Schoening, and other Cincinnati Casualty policyholders, may disregard the Replacement Cost Provision and receive an ACV payment without an affirmative election because it is unnecessary for the resolution of this case.

2.    **The Policy's Terms Dictate Two Valuation Methods—One with and One without Depreciation Deductions—and Allows Depreciation Deductions for ACV-Based Payments on Partial Structural Losses.**

Cincinnati Casualty's remaining argument is that the Policy allows it to deduct depreciation from *all* ACV-based payments under the Policy (i.e., whether the loss at issue will result in repair or replacement). (Doc. 4, #34–36). The Court agrees.

Start with the text of the Policy as applied to the facts here. Schoening claims that Cincinnati Casualty determined that "the damage [to the Property] could be repaired as opposed to [requiring] complete replacement." (Doc. 1, #6). This means that the insurer likely chose the second of four options at its disposal under the Loss Payment Provision in the event of a loss to the Property[14]—to "[p]ay the cost of repairing or replacing the lost or damaged property." (Doc. 4-1, #96). Consistent with the rest of the Loss Payment Provision, then, Cincinnati Casualty was required to "determine … the [Property's] *cost of* [] *repair* or replacement, in accordance with the applicable terms of" the Valuation Provision. (Doc. 4-1, #96 (emphasis added)). But, while the Valuation Provision would typically use "Actual Cash Value" to make this determination, remember that "Replacement Cost (without deduction for depreciation)" "replaced" that term. (*See id.* at #102). And the contents of the Replacement Cost Provision control because Schoening chose that specified optional coverage. (*Id.* at #65). And under the Replacement Cost Provision, Schoening cannot

---

[14] Alternatively, it is possible that Cincinnati Casualty was paying based on the first option— "the value of the lost or damaged property." (Doc. 4-1, #96). That matters little, though, as that value is also determined by reference the Valuation Provision. (*Id.*). So, either way, it is the operative definition of "Actual Cash Value" under the Policy that controls.

receive the replacement-cost-based payment until it actually repairs or replaces the damaged property. (*Id.* at #102–03). However, it could still elect to receive an ACV-based payment beforehand, while maintaining the ability to later claim additional replacement-cost-based payment. (*Id.* at #102).

As the Court found above, Schoening either elected, or the insurer (on its own accord) made, an ACV-based payment under the Replacement Cost Provision. Either way, Schoening in fact received an ACV-based payment. (Doc. 1, #6–7). And recall that the Definitions Section expressly defines ACV as "replacement cost less a deduction that reflects depreciation, age, condition, and obsolescence." (Doc. 4-1, #103). Against that backdrop, Schoening alleges that Cincinnati Casualty "calculate[d] its [ACV] payment obligations ... by first estimating the cost to repair the damage with new materials, and then [] subtract[ing] the estimated depreciation." (Doc. 1, #6). And the *only* thing Schoening challenges is that subtraction. But the subtraction is entirely consistent with the Policy language regarding ACV-based payments. At least that is the case so long as one reads the Loss Payment Provision (as modified by the Replacement Cost Provision) and the ACV definition in harmony, which the Court must. *See Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014), *aff'd sub nom. Journey Acquisition–II, L.P. v. EQT Prod. Co.*, 830 F.3d 444 (6th Cir. 2016) (explaining that, in construing contracts, Kentucky courts "read the various provisions of the contract as a whole" and "look to interpretations that promote harmony between any apparently conflicting provisions" (cleaned up)). To put it bluntly, the Policy, through

25

its ACV definition, allows Cincinnati Casualty to subtract estimated depreciation from ACV-based payouts for partial structural losses, whether the insurer made those ACV-based payments under the regular Policy terms or the Policy terms as amended by the Replacement Cost Provision.

Schoening complains that this means the "cost to repair" under the Policy will be determined on a "replacement cost" basis (as ACV is defined as "replacement cost less a deduction…"). That may be. But parties are free to write contracts as they see fit. True, it may seem odd to use the phrase "replacement cost" to refer to payments calculated based on "repair" costs. It's also true that the various intersecting Policy provisions perhaps could be more clearly written. But at least two reasons confirm why this reading is the only "reasonable interpretation." *Stone*, 34 S.W.3d at 810–11. First, the Policy itself reflects that reading in multiple instances. And, consistent with Kentucky law, the Policy "must be construed as a whole." *ISCO Indus., Inc.*, 587 F. Supp. 3d at 568 (quotation omitted). Second, not adopting such a reading of the Policy would effectively eliminate one of the two payment-valuation methods the Policy provides. And that, in turn, would allow insureds to recover replacement-cost-based payments without in fact first conducting repairs (in direct violation of the Policy's express terms) or without selecting (and potentially paying for) the optional replacement cost coverage.

As to the former, there are at least three instances in the Policy that imply that payments based on repair cost amounts can constitute what the Policy refers to as replacement-cost-based valuations. For example, in Section A. Coverage, 4.

26

Additional Coverages, g. Ordinance or Law, (1)(c)(a), the Policy explains that for buildings receiving additional "Replacement Cost" coverage (i.e., claims capable of being valued on a replacement-cost basis), the Policy covers "increased costs to comply with the minimum standards of an ordinance or law to: (a) *Repair or reconstruct* damaged portions of that building or structure." (Doc. 4-1, #80 (emphasis added)). Similarly, in a portion of the Loss Payment Provision (one that otherwise does not apply on the facts here), the Policy states that "[i]f [the optional Replacement Cost coverage] applies and the property is not *repaired <u>or</u> replaced*" the insurer will not pay "more than the lesser of" the ACV or the limit of insurance. (*Id.* at #97 (emphasis added)). And the Replacement Cost Provision itself likewise contemplates that repairs can be valued on a replacement-cost basis. (*See id.* at #102 ("We will not pay *on a replacement cost basis* for any 'loss': (1) Until the lost or damaged property is actually repaired *or replaced*[.]" (emphasis added)). In each of these instances, the Policy refers to a replacement-cost-based valuation method as applying in situations where the insured repaired the property instead of replacing it.[15]

Next, consider the effect of reading the word "repair" as strictly distinct from "replacement," and as requiring its own separate valuation method (apparently undefined in the Policy). That is what Schoening urges. It argues that, because the

---

[15] Additionally, the "ACV payment cover letter" that Schoening attached shows that while Cincinnati Casualty may have assessed that the damage to the Property could be repaired, it valued that repair on a replacement-cost basis. (Doc. 13, #225 n.4). In that letter, Cincinnati Casualty advises Schoening, consistent with the Policy, that "[o]nce the repairs have been completed your policy could pay up to $45,475.54 in replacement costs or also known as recoverable depreciation." (Doc. 13-1, #263). But at the same time, it listed the "Replacement Cost Value" of the building at $414,405.80. (*Id.*). In other words, it was using the phrase "replacement cost" to refer to a repair-based cost.

definitional provision for "Actual Cash Value" does not include the word "repair," but only "replacement," the former must be subject to a distinct valuation method—one where "repair cost" is assessed, and no depreciation is deducted from that valuation. (*See* Doc. 1, #6; Doc. 13, #221).

The Court disagrees. For starters, despite Schoening's entreaties, the Court cannot simply manufacture a third valuation method for the Policy. (*See* Doc. 13, #225–35). And pause for a moment to consider what the requested separate repair-cost-based method would look like. Schoening seeks an ACV-based payment without a depreciation deduction. So Schoening essentially reimagines the Policy's ACV definition along these lines: "'Actual cash value' means replacement cost with no deduction for depreciation."[16] That reading basically equates the two possible types of payments available under the Policy—an ACV-based payment and a replacement-cost-based payment.[17] Both would be identical, in that neither would allow a deduction for depreciation, thereby rendering the definition of ACV meaningless.

---

[16] The Policy talks about deductions for "depreciation, age, condition, and obsolescence." (Doc. 4-1, #103). The Court declines to speculate at this stage whether this is intended to be a single deduction with overlapping factors that could all perhaps be categorized as forms of depreciation, or instead would allow for separate deductions. *See, e.g.*, *Whitehouse Condo. Grp., LLC v. Cincinnati Ins. Co.*, 569 F. App'x 413, 415–20 (6th Cir. 2014) (treating all four as potentially distinct); (*see also* Doc. 13-1, #263 (including a line-item deduction only for depreciation). Again, all that Schoening challenges here is the deduction for depreciation. So those other categories (age, condition, and obsolescence), if distinct, are irrelevant.

[17] Although it is unclear whether replacement cost under the Optional Coverage would include deductions reflecting age, condition, and obsolescence. In this instance, at least, it appears that it would not based on the ACV cover letter Cincinnati Casualty sent to Schoening. (*See* Doc. 13-1, #263 (only including a line-item deduction for depreciation to arrive at ACV and not separate deductions for age, condition, and obsolescence)).

This would also mean that, even without selecting the optional replacement-cost coverage, insureds covered under the Policy would automatically receive what amounts to replacement-cost-based valuations on payments for repair claims. That is, the definition of ACV applies to both those who have, and those who do not have, the optional replacement-cost coverage—both groups can receive ACV-based payments. So under Schoening's reading, both groups (those with the Optional Coverage and those without) would be entitled to depreciation-free ACV-based recoveries.[18]

Further, because the insureds who select the optional replacement-cost coverage can elect to receive ACV-based *payments* before making repairs, (*see id*. at #102), Schoening's reading of ACV would entitle them to receive full-replacement-cost-based payments (i.e., without depreciation) without in fact making any repairs. That directly contravenes the Policy. (*See id*. at #102–03). The Court will not read the Policy in such a way that renders a definitional term meaningless and places insureds in a position to automatically contravene other policy provisions.

---

[18] The Complaint seems to admit as much when making its class allegations: "Certain amounts initially withheld as depreciation may be later repaid to some policyholders with replacement cost provisions in their policies, if any. However, policyholders who have been subsequently repaid for initially withheld depreciation still have incurred damages, at the least, in the form of the lost 'time value' of money during the period of withholding, *i.e.*, statutory or common law prejudgment interest on the amounts improperly withheld, for the time period of withholding." (Doc. 1, #11). That is, in Schoening's eyes, both those with and without replacement-cost-coverage are damaged by the withholding of depreciation in ACV payments. This makes clear that if the Court were to accept Schoening's reading of the Policy, non-replacement-cost-coverage policyholders may be entitled to non-depreciated replacement-cost-based payments anyway.

Schoening fares no better with its complaint that in contrast with its own Policy, "certain policies of insurance issued by other insurers expressly allow for the depreciation from repair costs when calculating ACV payments." (Doc. 1, #6). As already mentioned, it is admittedly true that the Policy could be clearer. That does not, however, require the Court to create an incoherent and contradictory policy out of the one under review.

### 3. Caselaw and Kentucky Administrative Regulations Also Support Cincinnati Casualty's Position.

Caselaw also supports the Court's interpretation of the Policy. In the years following *Farmland*, various courts have noted that insurers can deduct depreciation of materials from ACV valuations (for both partial and complete structural losses) "[b]ecause depreciation traditionally refers to lost value from the physical deterioration of the structure." *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 423 (6th Cir. 2020). While many insureds have challenged what the term "depreciation" *includes*—typically by arguing the term is ambiguous—a throughline in those decisions is that insurers can deduct *some* depreciation when calculating ACV. *Id.* at 419, 423 (holding, under Tennessee law, that insurer could "not include the cost of labor in calculating depreciation under its policy" but could include materials when calculating ACV); *Hicks v. State Farm Fire & Cas. Co.*, 751 F. App'x 703, 704 (6th Cir. 2018) (holding that the insurer "miscalculated [ACV] when it depreciated the cost of labor and materials *rather than simply materials*" (emphasis added)); *Brown*, 2016 WL 1644342, at *4 (finding that "the ordinary meaning of 'depreciation' allows an insurer to depreciate the value of labor that has merged with a finished good" but

30

does not "allow an insurer to depreciate the value of pure labor that has not merged with a finished good" when calculating ACV payments); *Franklin v. Lexington Ins. Co.*, 652 S.W.3d 286, 297 (Mo. Ct. App. 2022) (concluding that "depreciation, without a specific definition or provision in the insurance policy to say otherwise, applies to physical deterioration and does not include labor costs"); *Arnold v. State Farm Fire & Cas. Co.*, 268 F. Supp. 3d 1297, 1312 (S.D. Ala. 2017) (reasoning that "a reasonable insured could reasonably understand that depreciation in its everyday sense applies only to physical deterioration, and [] could reasonably understand that labor does not sustain such deterioration because it is not physical").

So while courts have excluded certain component parts from depreciation calculations, courts have not instructed that the term "depreciation" should be ignored wholesale in making ACV-based calculations. The best example is *Hicks*, where the Sixth Circuit applied the reasonable expectations doctrine—which interprets ambiguous terms in favor of the insured's reasonable expectations—to the undefined term "depreciation," and found that "[a] layperson confronted with [the home-insurance] policy could reasonably interpret the term depreciation to include only the cost of materials." *Hicks*, 751 F. App'x at 708–09. So the ambiguity extended only to what was included in the depreciation deduction, not to whether there is a depreciation deduction associated with ACV. *Id.* at 704.

Schoening argues that *Hicks* "did not opine on the … question of whether *any* depreciation could be depreciated under the forms at issue in that case." (Doc. 13, #229–30). The Court disagrees. The "sole question" in that case was whether

31

"depreciation" in Kentucky's ACV regulation (806 Ky. Admin. Regs. 12:095(9)(2)) meant materials and labor, or simply materials. *Hicks*, 751 F. App'x at 708. The Court answered: "simply materials." *Id.* at 704. So the Sixth Circuit, interpreting Kentucky's ACV regulation, directly spoke to whether some depreciation could be deducted from the ACV calculation at issue there.

Finally, it is worth noting that "actual cash value" is commonly defined as replacement cost less depreciation in Kentucky. *See Brown*, 2016 WL 1644342, at *2. So accepting Schoening's unique interpretation for partial structural losses would undoubtedly impact common insurance practice in the state. In fact, as mentioned, Kentucky's administrative regulations, which form "a model consumer protection statute," define ACV in this manner. *Hicks*, 751 F. App'x at 707; 806 Ky. Admin. Regs. 12:095(9)(2) ("If the insurance policy provides for the adjustment and settlement of losses on an actual cash value basis on residential fire and extended coverage, the insurer shall determine actual cash value as follows: replacement cost of property at the time of the loss less depreciation, if any."). And *Hicks*, while interpreting that regulation, was evaluating a repair claim. *See Bailey v. State Farm Fire & Cas. Co.*, No. CIV.A. 14-53, 2015 WL 1401640, at *2 (E.D. Ky. Mar. 25, 2015), *aff'd sub nom. Hicks*, 751 F. App'x 703. In other words, accepting Schoening's argument would require augmenting, or at least implying the invalidity of, the Sixth Circuit's interpretation of Kentucky's ACV regulation as applied to a partial structural loss, upon which many property insurance contracts certainly rely. The Court declines to upend such a holding.

### 4. *Farmland* **Does Not Change the Result.**

But what about *Farmland*? According to Schoening, *Farmland* "is the only case requiring review before denying [Cincinnati Casualty's] Motion to Dismiss." (Doc. 13, #229). Once again, the Court disagrees. *Farmland* had a narrow holding limited to the particular insurance policy at issue there; it is neither controlling precedent as a result nor is it persuasive because of the key differences in policy language in this case.

*Farmland* dealt with a disputed fire insurance claim on appeal from a jury verdict awarding the insured $2 million in punitive damages for bad-faith violations of the Kentucky Unfair Claims Settlement Practices Act (KUCSPA). 36 S.W.3d at 371. The insurer brought several challenges, but the relevant challenge for present purposes involved the insured's claim that the insurer misrepresented the ACV policy provision. *Id.* at 372. In granting the insured's motion for partial summary judgment on the issue, the trial court found that the insurer's adjuster had misrepresented that provision by claiming that ACV "meant the cost of *repair* less depreciation [when] in fact the contract expressly stated that [ACV] was the cost of *replacement* less depreciation." *Id.* (emphasis in original). The Supreme Court of Kentucky, in affirming that finding, noted that the relevant policy clearly stated "that actual cash value mean[t] replacement cost less depreciation." *Id.* at 377. Farmland had argued that the policy could have instead meant "repair less depreciation because the additional contractual language 'property damaged or destroyed' implie[d] that some property [would] need to be repaired, as it is only damaged, whereas only the destroyed property [would] need to be replaced." *Id.* The court, however, found that

33

argument unpersuasive and nothing more than a "creative effort to subvert the plain language of the policy" *Id.*

So far, that sounds fairly promising for Schoening. But a closer look at the policy language in *Farmland* illustrates why the case is not as helpful as Schoening suggests. The loss settlement provision the *Farmland* court evaluated stated:

> We will determine the value of covered property in the event of loss or damage at the actual cash value as of the time of the loss or damage. We will not pay more for loss or damage than the least of:
> …
> > (b) The cost to repair or replace the lost or damaged property with similar property intended to perform the same function when replacement with identical property is impossible or unnecessary.
> …
> > (d) The value of the damaged property.

*Farmland*, 36 S.W.3d at 371 (emphasis omitted). The *Farmland* policy also defined ACV as "replacement cost of the property damaged or destroyed at time of loss, less depreciation." *Id.*

According to Schoening, *Farmland* involved "nearly identical policy language," making the Kentucky Supreme Court's decision controlling on the interpretive issue here. (Doc. 13, #226). But "nearly" is not "exactly." And here there is a key difference that compels a different outcome. The Loss Payment Provision in the Policy here said that Cincinnati Casualty would "determine the value of the lost or damaged property, *or the cost of its repair or replacement*, in accordance with" the Valuation Provision. (Doc. 4-1, #96 (emphasis added)). And the Valuation Provision in turn incorporates the definition of ACV. So, here, the ACV definition applies to *both* "the value of the lost or damaged property" *and* "the cost of its repair or replacement." (*Id.*).

34

The insurance policy in *Farmland*, by contrast, said only that the insurer would "determine *the value of covered property* in the event of loss or damage at the *actual cash value* as of the time of the loss or damage." 36 S.W.3d at 371 (first emphasis added). In other words, the policy language in *Farmland* provides that only *one* of the relevant payment sub-provisions (the value of the covered property) is subject to ACV, not both (the value of the property and the cost of repair or replacement). That makes the two policies vitally different on the sole issue here; under the Policy, the depreciation adjustment included in the ACV definition applies to payments under either payment sub-provision of the Loss Payment Provision.

In sum, Cincinnati Casualty is correct that "[t]he Kentucky Supreme Court did not rule that material depreciation costs could not be deducted from an ACV payment." (Doc. 4, #34). Rather, *Farmland* held that under that particular policy's language and under those particular facts, the insurer could not deduct depreciation from under-estimated repair costs. As a result, the Court will not extend *Farmland*'s application to a similar, but materially different insurance policy.

### 5. Schoening's Actual Cost Arguments Also Miss the Mark.

Schoening makes one final argument the Court must address. It claims that the Court's adoption of Cincinnati Casualty's "actual cost argument" would both "break new ground" and "represent a sea change" in the handling of property insurance claims.(Doc. 13, #236). In that way, Schoening seems to read the insurer's motion to dismiss as arguing that Cincinnati Casualty policyholders would be required to submit evidence of repairs or replacements to receive ACV payments. (*See*

*id.* at #235–40). Worse yet, Schoening says that this reading would create absurd results, allowing property insurers to sue their insureds to recover previously paid amounts for ACV coverage in certain cases where repairs end up costing less than the ACV payment. (*Id.* at #236). The Court does not read Cincinnati Casualty's argument in the same manner. And neither does Cincinnati Casualty. In its Reply, the insurer clarifies that its argument is merely about the Policy setting a limit on its liability under the Replacement Cost Provision:

> That is, Cincinnati [Casualty] owes an ACV payment, which includes a deduction for depreciation. And after repairs are completed, Plaintiff may submit a claim for the unrecovered depreciation. But if Plaintiff's repair costs are ***less*** than the ACV payment, the Plaintiff cannot recover any depreciation because the Policy states that Cincinnati [Casualty] 'will not pay more for "loss" [on a replacement cost basis]' than 'the amount Schoening actually spends … to repair or replace the lost or damaged property."

(Doc. 16, #290–91 (emphasis in original) (cleaned up) (quoting Doc. 4-1, #103)). Indeed, no Policy provision allows Cincinnati Casualty to seek a return of portions of previously-made ACV-based payments should an insured end up repairing or replacing property at a cost of less than that ACV-based payout. Rather, the Policy only limits additional replacement-cost-based payments *to the insured* in light of what the insured actually spent repairing or replacing a covered property. And to be clear, nothing in Cincinnati Casualty's argument or in the Court's decision requires policyholders to submit evidence of actual repairs or replacements to receive ACV-based payments.

## C. The Court Does Not Address Cincinnati Casualty's Class Action-Related Arguments.

In support of its motion to dismiss, Cincinnati Casualty also argues that Schoening lacks constitutional standing to bring Arizona-based claims and, alternatively, moves to strike Schoening's class allegations by relying on Rule 23 predominance arguments. (Doc. 4, #36–43). Cincinnati Casualty's standing argument, which it bases on Article III's requirements, (*see id.* at #37), and which, to be clear, concerns Schoening's standing to sue on behalf of putative Arizona claimants, not Schoening's standing to sue on its *own* claim, is likely misguided. *See Generation Changers Church v. Church Mut. Ins. Co.*, 693 F. Supp. 3d 795, 803–07 (M.D. Tenn. 2023). And its Rule 23 arguments are likely premature. But because neither argument involves a threshold jurisdictional inquiry (as no one suggests that Schoening lacks Article III standing as to Schoening's own claims), the Court need not resolve these arguments before addressing the merits. And the Court's finding that Schoening's claims lack merit as a matter of Kentucky law then forecloses the Court's need to consider these alternative arguments.

\*     \*     \*

All told, the Court finds that, under the unambiguous Policy language, Cincinnati Casualty may deduct depreciation of materials from ACV calculations when evaluating partial structural loss claims. The Optional Coverage under the Policy provides only two valuation methods—replacement cost and ACV. The latter, ACV, "means replacement cost less a deduction that reflects depreciation, age, condition and obsolescence." (Doc. 4-1, #103). Replacement cost is payment "without

deduction for depreciation." (*Id.* at #102). And unless and until an insured repairs or replaces a covered property, the replacement-cost based measure is not available to that insured. Schoening's proposed reading would effectively grant insureds an entitlement to replacement cost coverage, which is inconsistent with the Policy's terms.

<strong>CONCLUSION</strong>

For the reasons discussed above, the Court **GRANTS IN PART** Defendant The Cincinnati Casualty Company's Motion to Dismiss the Complaint or Alternatively to Strike Class Allegations (Doc. 4). The Court **DISMISSES WITH PREJUDICE** Plaintiff's Complaint (Doc. 1) because the Court's determination results as a matter of law, meaning no amendment to the Complaint could cure the deficiency. Accordingly, the Court **DIRECTS** the Clerk to enter judgment and **TERMINATE** this case on its docket. Finally, the Court **DENIES IN PART AS MOOT** Cincinnati Casualty's alternative Motion to Strike Class Allegations (Doc. 4).

> **SO ORDERED.**

March 13, 2025
 **DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**